IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF MICHIGAN ex rel. Cathryn Pawlusiak,   :   :   Plaintiffs,   :   :  v.   :   :  Beaumont Health System, fka William Beaumont Hospital, Academic Heart & Vascular, PLLC, O'Neill, Grines, Safian, PLLC,   :  Dr. William O'Neill, Dr. Cindy Grines, Dr. David Haines, Dr. Robert Safian,   :  Dr. James Goldstein, Dr. Simon Dixon and Dr. George Hanzel, Beaumont Oncology Network, P.C.   :  jointly and severally,   :   Defendants.   :  | Civil Action No: 11-  **FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)**  **DO NOT PLACE IN PRESS BOX**    **DO NOT ENTER ON PACER**  **JURY TRIAL DEMANDED** |

**FALSE CLAIMS ACT COMPLAINT
AND DEMAND FOR JURY TRIAL**

**FILING UNDER SEAL**

1. This is an action under the federal False Claims Act and Michigan Medicaid False Claims Act, this complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days and shall not be served on defendants until the Court so orders. The government may elect to intervene and proceed with the action within sixty (60) days after it receives the Complaint.

## INTRODUCTION

2. This case is based upon illegal payments made by Defendant Beaumont Health System, formerly known as William Beaumont Hospital ("Beaumont") to Defendants O'Neill, Grines, Safian, PLLC, Academic Heart & Vascular, PLLC, Dr. William O'Neill, Dr. Cindy Grines, Dr. David Haines, Dr. Robert Safian, Dr. James Goldstein, Dr. Simon Dixon and Dr. George Hanzel (collectively, "Cardiologist Defendants") to illegally induce them to refer patients, including Medicare and Medicaid patients, exclusively or nearly exclusively to Beaumont for health care services, including cardiology services.

3. From 2001 through the present, Beaumont paid the Cardiologist Defendants millions of dollars a year as inducements for the referral of cardiology services to Beaumont.

4. In order to conceal the true nature of the payments, Beaumont disguised the payments as "fees" for part-time medical directorships. As set forth below, however, those fees were at rates far in excess of fair market value and for unnecessary, redundant or duplicative duties.

5. In exchange for the payments, the Cardiologist Defendants referred large volumes of patients for hospital admissions or procedures as outpatients at Beaumont for cardiology services, which are one of the biggest sources of revenue for Beaumont.

6. In other words, Beaumont paid the Cardiologist Defendants millions of dollars a year far beyond reasonable compensation level for the services rendered to secure hundreds of millions of dollars in revenue from the Cardiologist Defendants' referrals to Beaumont.

7. Claims submitted by Defendants for patients referred by the Cardiologist defendants with improper financial relationships are false or fraudulent claims because Defendants had no entitlement to payment of such unlawfully obtained referrals.

## PARTIES

8. Cathryn Pawlusiak is a hospital executive who currently maintains a residence in

Birmingham, Michigan.

9. Beaumont Health System, formerly known as William Beaumont Hospital ("Beaumont") is a full service hospital system based in Royal Oak, Michigan with satellite operations in Troy, Michigan and Grosse Pointe, Michigan and it claims to be the third largest Medicare provider in the United States.

10. Academic Heart & Vascular, PLLC, ("AHV") is a cardiology group private practice owned by Drs. Cindy Grines, David Haines, Robert Safian, James Goldstein, Simon Dixon and George Hanzel and located in Royal Oak, Michigan.

11. O'Neill, Grines, Safian, PLLC, ("OGS") was a cardiology group private practice that was owned by Drs. William O'Neill, Cindy Grines, David Haines, Robert Safian, James Goldstein, Simon Dixon and George Hanzel. It was the predecessor to AHV.

12. Dr. William O'Neill is a cardiologist previously licensed to practice medicine in Michigan and who currently resides in Miami, Florida and serves as the Executive Dean of the Clinical Affairs at the University of Miami Health Services.

13. Dr. Cindy Grines is a cardiologist licensed to practice medicine in Michigan who resides in Pine Lake, Michigan.

14. Dr. David Haines is a cardiologist licensed to practice medicine in Michigan who resides in Lake Angelus, Michigan.

15. Dr. Robert Safian is a cardiologist licensed to practice medicine in Michigan who resides in Bloomfield Hills, Michigan.

16. Dr. James Goldstein is a cardiologist licensed to practice medicine in Michigan who resides in Bloomfield Hills, Michigan.

17. Dr. Simon Dixon is a cardiologist licensed to practice medicine in Michigan who resides in Birmingham, Michigan.

3

18. Dr. George Hanzel is a cardiologist licensed to practice medicine in Michigan who resides in Birmingham, Michigan.

19. Beaumont Oncology Network, P.C. is an oncology practice group established by Beaumont for oncologists practicing at Beaumont and its Cancer Centers.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this case pursuant to 31 U.S.C. §3730(b), which allows a private person to bring suit for a violation of the False Claims Act, pursuant to 28 U.S.C. §1345, which provides the District Courts with original jurisdiction over all civil actions commenced by the United States of America, pursuant to 28 U.S.C. §1331, because this action arises under the laws of the United States.

21. The acts proscribed by 31 U.S.C. §3729 *et seq.* and complained of herein were performed by the defendants who transact business and/or reside in this district. Therefore, this Court has personal jurisdiction over defendants, and venue is proper in this district, pursuant to 31 U.S.C. §3732(a).

22. Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) and (c), because the defendants are subject to personal jurisdiction in this District and transact business in this District.

23. The Michigan Medicaid False Claims Act claims are filed pendent to the federal claims filed herein and pursuant to M.C.L. 400.601-400.613.

## GENERAL ALLEGATIONS

24. Ms. Pawlusiak is an experienced hospital executive who has extensive experience managing the business operations of hospitals, health systems and physicians practices, including cardiology.

25. In February 2006, Ms. Pawlusiak was hired by William Beaumont Hospital as

4

Administrative Director of Strategy and Business Development for Corporate Cardiology.

26. One of Ms. Pawlusiak's first job duties at Beaumont was to manage the development of the cardiology service line. As part of this responsibility, she engaged in the financial analysis of Beaumont's cardiology budget, including cardiologist salaries.

27. The cardiology service line is one of the largest revenue areas for Beaumont. The total cardiology clinical service charges at Beaumont typically exceed $600 million a year and provide over $200 million in annual net revenue to Beaumont.

28. Upon reviewing the salaries budgeted for the cardiologists at Beaumont, Ms. Pawlusiak realized that, for the last several years, the total amount of salaries budgeted and paid for physician services, including medical directorships within the division, appeared to be excessive overall, but in particular, members of a certain influential cardiology group were being paid extremely excessive annual fees for part-time medical director roles that were redundant, unnecessary to the operation of the hospital and/or not performed.

29. That influential group of cardiologists was Defendant O'Neill, Grines, Safian, PLLC and its cardiologist owners, Defendants Drs. William O'Neill, Cindy Grines, David Haines, Robert Safian, James Goldstein, Simon Dixon and George Hanzel (the "OGS Group").

30. In 2006, the members of the OGS Group received annual fees as part-time medical directors.

31. Those fees were only for part-time work as medical directors and chiefs of services, not the total compensation received by the cardiologists. The salaries were classified as one hundred percent Medicare Part A expenses, and did not include any compensation for clinical services that the cardiologists billed and collected separately through Medicare Part B. The OGS Group's contracts allowed them to spend up to two days a week in private practice clinical service activities which were billed by OGS/AHV through Medicare Part B.

32. In addition, many of the medical director positions held by the OGS Group cardiologists were either, unnecessary, redundant or duplicative duties. Often the reason for payment of the fees was contrived and the work product itself was not monitored.

33. As additional compensation, the OGS Group benefited from a Beaumont account, the Chief's Discretionary Fund, initially controlled by the Chief of Cardiology and founding partner of OGS, Dr. William O'Neill, which paid for supplies in their private practice, travel for physicians and others, meetings and dinners, accountant and consulting fees, among other uses. This account was funded annually by Beaumont, Royal Oak for approximately $100,000.

34. In other words, the members of the OGS Group were paid extraordinarily high fees and benefits for part-time work as medical directors for work that was often not even necessary nor performed.

35. Ms. Pawlusiak was concerned that the OGS Group had been paid such clearly excessive and unsubstantiated fees over the previous five years. However, Ms. Pawlusiak learned the true nature of the medical director fees when Beaumont was in danger of losing the OGS Group members to other hospitals.

Substantial Increases in Already Excessive Fees

36. The employment contracts for the OGS Group members to serve as part-time medical directors were set to expire in September 2006, soon after Ms. Pawlusiak began working in cardiology.

37. Several months after Ms. Pawlusiak's arrival, the President of OGS and Chief of Cardiology, Dr. William O'Neill decided to leave OGS and the state of Michigan to take a position as Executive Dean of University of Miami Health Services in Florida.

38. The remaining members of the OGS Group, Drs. Cindy Grines, David Haines, Robert Safian, James Goldstein, Simon Dixon and George Hanzel, renamed the remaining group

6

Academic Heart and Vascular PLLC ("AHV").

39. Knowing that its contracts with Beaumont were set to expire, AHV made it clear to Beaumont that its members were considering switching to another Detroit Metropolitan area hospital health system.

40. In fact, AHV advised Beaumont that the group was actively engaged in employment conversations with Henry Ford Health System.

41. The management team of Beaumont was concerned because the AHV cardiologists were well-known in the industry and, therefore, referred a large volume of patients to Beaumont for cardiology services and promoted the reputation of Beaumont as a regional and national referral center for high-end interventional cardiology.

42. Relator is aware of exploration of recruitment opportunities being considered and reported to her by AHV physicians and their staff.  Recruitment discussions with Henry Ford Health System and University of Michigan were reported.  Beaumont was concerned that the referrals and admissions generated for Beaumont by the AHV group would be transferred to a competing facility.  Beaumont wanted to retain the AHV members on staff and ensure de facto exclusivity in terms of admissions; therefore Beaumont actively worked to negotiate new five-year agreements with AHV members.

THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK

43. Beaumont offered to significantly increase the already excessive payments to the AHV members in the new contracts. Under the new contracts, the AHV member cardiologists' director fees increased dramatically:

| AHV Cardiologist | 2006 Director Fees | 2007 Director Fees |
|---|---|---|
| Dr. Haines | ~$550,000 | $734,218 |
| Dr. Grines | $519,549 | $704,687 |
| Dr. Goldstein | ~$500,000 | $677,075 |
| Dr. Safian | ~$500,000 | $671,304 |
| Dr. Dixon | ~$200,000 | ~ $450,000 |
| Dr. Hanzel | ~$160,000 | ~ $430,000 |

44. Prior to 2006, the AHV members were receiving approximately $2.4 million for the title of part-time medical directors, but their pay was significantly increased -- to approximately $3.7 million in 2007.

45. The new 2007 annual payment amounts were not based on any significant increase in duties or responsibilities for the AHV members.

46. For example, Dr. Haines replaced Dr. O'Neill as Chief of the Cardiology Department at Beaumont, but the other AHV member cardiologists did not spend any more time acting as medical directors as they had the previous year. The amount of money attributable to Dr. O"Neill in the previous year was apportioned to AHV, despite his departure.

47. Moreover, the cardiology department did not really need the AHV members to serve as part-time medical directors. In 2007, Beaumont's cardiology department consisted of approximately 200 cardiologists. Over 40 of these cardiologists received medical director or faculty fees. In the majority of circumstances, a substantial portion of the individuals' compensation was allocated as Medicare Part A expense. Beaumont paid the AHV members to be part-time directors of a department that was made up of almost 20% supervising faculty or directors.

48. In fact, many of the cardiology medical directorship titles were redundant. For example, in 2007, Dr. Simon Dixon's title was "Medical Director of Cardiac Catherization Laboratories" and Dr. Renato Ramos held the title of "Medical Director Cardiac Cath Lab Operations," while Dr. Phil Kraft was "Medical Director of the Cardiac Cath Lab" at the Troy location.

49. Moreover, during the June 2006 contract negotiations, Janet Caswell-Robinson, a representative of AHV, engaged in several conversations with Ms. Pawlusiak during which she asked Ms. Pawlusiak for information regarding the amount of revenue generated for the AHV members or other indicators of the value AHV brought to Beaumont.

50. There was significant concerns about losing grants and donations to Beaumont that heightened anxiety and concern about losing the AHV group and their referrals.

51. Beaumont management was aware of the financial impact, volume and value of referrals to Beaumont by the AHV physicians and based the increased payment to AHV on the value the group provided to Beaumont as opposed to significant or altered new job duties or work assignments.

52. The dramatic increase in director fee payments were not for a legitimate purpose, but were, in fact, Beaumont's payment to retain the large volume of referrals from the AHV members for lucrative cardiology services, and to maintain the reputation of Beaumont as a regional and national cardiology referral center for high-end interventional cardiac services.

53. The annual payments under the June 2006 contracts continued during the five-year term of the contracts.

Compensation Far Above Fair Market Value

54. A national survey by the Medical Group Management Association ("MGMA") indicates that, in 2007, across the country, physicians received an average of approximately $50,000

to $200,000 annually to serve as medical directors at hospitals.

55. In 2007, however, Beaumont paid the AHV members anywhere from approximately $430,000 to $734,218 to serve as part-time medical directors.

56. Moreover, a national MGMA survey of cardiologists in 2007 indicates that cardiologists across the country received director fees in the range of $50,000 to $200,000.00, and TOTAL compensation of between $373,000 and $773,000 for their full-time and combined salaries, clinical service reimbursement (including Part B monies) and/or medical director salaries.

57. In 2007, 2008 and beyond, Beaumont paid the AHV members anywhere from approximately $430,000 to $734,218 solely for their part-time work as medical directors or service chiefs and separate from compensation they collected as a result of billings from clinical services performed while in private practice up to approximately two days per week for each member.

58. As a part of her job responsibility, Relator prepared an economic analysis of the value of referral from AHV and its physicians which was used by Beaumont in their determination of the amounts to be paid for the director fees.

Beaumont's Practice of Paying for Physician Referrals

59. In February of 2007, Beaumont promoted Ms. Pawlusiak to a corporate role as Vice President of Service Line Development during which she began integration of multiple clinical programs across the health system. The Oncology Service Line became a first tier area of focus for Ms. Pawlusiak.

60. Oncology service is also one of the largest revenue areas of Beaumont Hospital. The total oncology clinical service charges at Beaumont typically exceed $300 Million a year and provide upwards of $100 Million in annual net revenue to Beaumont.

61. Between 2006 and 2008, Beaumont funded the creation of Beaumont Oncology Network, P.C. ("BON") in response to growing competition in the cancer care industry, particularly

10

the arrival of the national 21 Century Oncology network in southeast Michigan.

62. Although Beaumont characterized BON as a business model that would enhance quality, the primary purpose was to align the economic interests of the local oncologists and Beaumont and ensure a continued stream of referrals. Beaumont spent over $2 million to develop the BON model, including paying local oncology physicians and others to develop the early design of the BON model.

63. Beaumont provided initial funding to BON and, under a model that was created prior to Ms. Pawlusiak's arrival, BON oncologists were to be paid based on a "point system" formula that took into consideration such activities as an oncologist's attendance at meetings, participation in lectures and referrals of Medicare and other patients to Beaumont for inclusion in federally funded research programs. A second major aspect of the BON model was the creation new oncology physician leadership positions in which the incumbents would serve as medical directors of various oncology services at Beaumont and be paid by Beaumont while at the same time serve as officers of BON and be compensated for the same type of work through BON. These were referred to as the "double-hatted" positions.

64. After approval of the BON model by the Beaumont Board of Directors, Ms. Pawlusiak was tasked with implementing the BON model, including the physician incentive formula, the creation of quality metrics, and creating physician job descriptions, among other tasks.

65. Ms. Pawlusiak reported her concerns to the Beaumont Corporate Compliance Department, the Beaumont system Chief Operating Officer and Chief Medical Officer to whom she reported. In addition she recommended several alternative models and approaches for consideration in an attempt to improve Beaumont quality and efficiency of care.

66. Ms. Pawlusiak was laid-off by Beaumont three months later.

67. In addition, during her time at Beaumont, Ms. Pawlusiak was also assigned to help

Beaumont retroactively create job descriptions for medical directors in other departments that were being paid medical director fees with no written detailed description of their responsibilities or duties.

68. Ms. Pawlusiak worked with Michael Dixon, Director of Beaumont Human Resources, and Tom Thompson, Vice President of Professional Services, to retroactively compile those missing job descriptions for the medical directors at Beaumont.

69. Ms. Pawlusiak was laid-off prior to the completion of that project.

## REGULATORY FRAMEWORK

70. Ms. Pawlusiak brings this *qui tam* action in the name of the United States of America and the State of Michigan against the Defendants, jointly and severally. This is an action pursuant to the False Claims Act, 31 U.S.C. §3729 *et seq.* ("FCA") to recover damages and civil penalties for false statements and claims that defendants made or presented to the United States and the State of Michigan. The violations arise out of defendants' requests for payment by Medicare and Medicaid and to the federal and state health care programs (hereinafter, the "Government" – which includes the State of Michigan) based on false claims for hospital and cardiology services. The false claims arise out of violation of self-referral prohibitions and anti-kickback laws, as more fully set forth below.

71. By falsely billing, as set forth in this Complaint, the defendants knowingly caused the Government to pay Defendants more than it would have had defendants followed the proper billing procedures.

72. Realtor brings this action for violations of the FCA on behalf of herself and the United States of America pursuant to 31 U.S.C. § 3730(b)(1) and the State of Michigan pursuant to the Michigan Medicaid False Claims Act, M.C.L. 400.601-400.613 (hereinafter, the "Acts").

12

73. As required by the Acts, Ms. Pawlusiak has provided to the Attorney General of the United States, the United States Attorney for the Eastern District of Michigan and the Attorney General of the State of Michigan, simultaneous with the filing of the original complaint, a statement of all material evidence and information related to the complaint. This disclosure statement is supported by material evidence known to plaintiff at his filing establishing the existence of Defendants' false claims.

74. The federal False Claims Act provides that those who knowingly and willfully make or cause to be made any false statement or representation of a material fact in any application for any benefit or payment from the federal government is liable for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the federal government sustains because of those acts. 31 U.S.C. § 3729(a).

75. Federal regulations also provide that that a physician or entity entering into any arrangement or scheme who knows, or should know, that the arrangement has a principal purpose of circumventing the prohibition on referrals set out in the Stark law shall be punishable by a civil monetary penalty of $100,000. 42 C.F.R. §§1003.102(b)(10) and 1003.103(b).

76. The Medicare Program is a health insurance program for individuals 65 years and older, certain disabled individuals under age 65, and people of any age who have permanent kidney failure. The Medicare statute is codified at 42 U.S.C. § 1395 (Title XVIII of Social Security Act, 42 U.S.C. § 483.1 *et seq.*).

77. The Medicaid Program is a joint federal-state program funded under Title XIX of the Social Security Act. 42 U.S.C. § 1396 *et seq.* As a prerequisite to enrollment as a provider in the Medicaid Program, hospitals are required to enter into provider agreements and agree, among other things, to comply with federal and state provider participation requirements as a condition of federal and state funding. 42 U.S.C. § 1396a(w).

78. In 1972, Congress enacted the federal health care Anti-Kickback Statute, 42 U.S.C. § 1320a-7b *et seq*., which prohibited payments, directly or indirectly designed to induce a person to refer or recommend services that may be paid for by federal government.

79. The federal health care Anti-Kickback Statute provides that those who knowingly and willfully solicit or receive, offer or pay receive anything of value, whether directly or indirectly, in exchange for or to induce the referral of items or services for which a federal health care program may make payment shall be guilty of a felony. 42 U.S.C. § 1320a-7b(b)(1).

80. In 1989, Congress granted the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), the power to enforce prohibitions on physicians referring Medicare patients for designated health services to entities in which those physicians have a financial interest. Those prohibitions are codified in 42 U.S.C. §1395nn and are often referred to as the "Stark Law," after U.S. Representative Pete Stark, who introduced the legislation.

81. In 1993, the Stark Law was amended to, among other things, also apply to Medicaid patients. The 1993 amendment of Stark Law is often referred to as "Phase II" of the Stark Law.

82. As a condition of participation in the Medicare program and as a condition precedent to the receipt of payment or reimbursement from Medicare of costs incurred for treating and providing care to Medicare beneficiaries, Beaumont completed cost reports that contained certifications by Beaumont that it was familiar with the laws and regulations regarding the provision of healthcare services, and that the services identified in the cost reports were provided in compliance with Medicare laws and regulations.

83. Based on Medicare regulations and laws cited herein, if costs or expenses are billed to Medicare through the submission of false cost reports, then the cost reports are false claims to Medicare because they are based on fraudulent activities and billings of Defendants.

14

84. The Defendants knowingly and intentionally planned and initiated the above-described scheme to circumvent and violate healthcare fraud and obtain and/or inflate payments from the Government that the Government, but for the false statements, would not have paid. This fraudulent maximization of Government reimbursement resulted in higher income, salary, bonuses and other payments to each defendant. The above-listed knowing and/or reckless violations of the Stark Law and the anti-kickback Acts rendered Defendants out of compliance with both Medicare and Medicaid, and ineligible to receive Medicare and/or Medicaid reimbursements for services.

85. Accordingly, all reimbursement claims submitted to Medicare and/or Medicaid were improper and fraudulent.

## COUNT I

### False Claims Act - Presentation of False Claims

86. Ms. Pawlusiak realleges and incorporates paragraphs 1 - 85 of this Complaint as if fully set forth herein.

87. In performing the acts described above, Defendants through their own acts or through the acts of their officers, knowingly and/or recklessly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1).

88. The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments, which resulted in its being damaged in an amount to be determined.

## COUNT II

### False Claims Act - False Statements

89. Ms. Pawlusiak realleges and incorporates paragraphs 1 - 88 of this Complaint as if

fully set forth herein.

90. In performing the acts described above, Defendants through their own acts or through the acts of their officers, knowingly made, used or caused to be made or used, a false record of statement to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. §3729(a)(2).

91. The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments which resulted in its being damaged in an amount to be determined.

## COUNT III

### Reverse False Claims

92. Ms. Pawlusiak realleges and reincorporates paragraphs 1 - 91 of this Complaint as if fully set forth herein.

93. In performing the acts described above, Defendants knowingly used false records and statements to conceal the obligation to reimburse the federal Government and the State of Michigan for monies improperly retained, in violation of 31 U.S.C. §3729(a)(7).

94. Through Defendants' actions of improperly retaining funds to which they are not entitled, the United States has been deprived of the use of these monies and is entitled to damages in an amount to be determined.

## COUNT IV

### Michigan Medicaid False Claims Act - Presentation of False Claims

95. Ms. Pawlusiak realleges and incorporates paragraphs 1 - 94 of this Complaint as if fully set forth herein.

96. In performing the acts described above, Defendants through their own actions or through the acts of their officers, knowingly presented, or caused to be presented, to an officer or

employee of the State of Michigan, a false claim under the Michigan Medicaid False Claims Act in violation of MCLA 400.601 *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Pawlusiak respectfully requests that this Court enter judgment against Defendants as follows:

a. That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this Complaint, as the Civil False Claims Act, 31 U.S.C. § 3729 et seq. provides;

b. That civil penalties of $5,500 to $11,000 be imposed for each and every false claim that the Defendants caused to be presented to the United States;

c. That civil monetary penalties of $100,000 be imposed against each defendant for entering into an arrangement that has a principal purpose of circumventing the prohibition on referrals set out in the Stark law;

d. That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which Ms. Pawlusiak necessarily incurred in bringing and pressing this case;

e. That Ms. Pawlusiak be awarded the maximum amount allowed pursuant to the False Claims Act;

f. That the State of Michigan be awarded damages in the amount of three times the damages sustained by the State of Michigan because of the false claims alleged in this Complaint, as the Michigan Medicaid False Claims Act provides;

g. That necessary expenses, costs, and reasonable attorney's fees be awarded as provided by the Michigan Medicaid False Claims Act;

h. That Ms. Pawlusiak be awarded the maximum amount allowed pursuant to the

    Michigan Medicaid False Claims Act; and,

i. That this Court award such other and further general, equitable, and legal relief as it deems proper.

## DEMAND FOR A JURY TRIAL

Relator demands a jury trial on all claims alleged herein.

        Respectfully submitted,

By:   /s/ J. Marc Vezina_____
      J. Marc Vezina
      **VEZINA AND GATTUSO, L.L.C.**
      LA Bar No. 24683
      TX Bar No 24000141
      401 Weyer Street, P. O. Box 461
      Gretna, LA 70054
      Tel. (504) 368-5223
      Fax (504) 361-3624

      **Attorneys for Relator Ms. Pawlusiak**